GEORGE D. PAPPAS, complainant,

*v.*

FOSTER SCREEN COMPANY, INCORPORATED, a corporation, defendant.

[Decided March 1st, 1924.]

1. Where a person acts for another who accepts the fruit of his efforts the latter must be deemed to have adopted the methods employed, as he may not, though innocent, receive the benefits and at the same time disclaim responsibility for the measures by which they were acquired.

2. Where a man contracts with agents under circumstances sufficient to impress him that the agents were not acting within the scope of their authority he is chargeable with their fraud and he cannot rescind his contract with the principal when he finds that he will lose thereby.

3. Where a contract of subscription to stock was fraudulently altered before it reached the company the minds of the parties did not meet and the subscriber may have relief against the company for the transaction involved.

On final hearing.

*Mr. Frank E. Bradner,* for the complainant.

*Messrs. Lum, Tamblyn & Colyer (Mr. Lum),* for the defendant.

BACKES, V. C.

The complainant seeks to rescind three sales of preferred capital stock of the defendant company and to recover the purchase price. The first cause of action involves two of the sales. As to the first sale, the action is abandoned, and as to the second, relief is denied for failure to sustain the cause for action, in law and in fact.

The company's authorized preferred capital stock is $250,000, shares $10 each, and thirty-seven thousand five hundred shares of non-par value. The latter was originally issued for property purchased—patent rights appraised at $50,000. Of the non-par value shares, twelve thousand five hundred were returned to the treasury of the company to be given to purchasers of the preferred stock as bonus, at the rate of one share to two of the preferred. The complainant owned sixty shares of the preferred stock, for which he had paid $600, and thirty of the bonus shares when the third "sale," the subject of the second cause of action, was negotiated. At that time, and for some time before, the company was looking for capital to extend its operations and had retained Stone & Company, of New York, stock sales promoters, to market its stock. Brown, a salesman for Stone & Company, called on the complainant, a prospect, with the stock last and then recently bought by him—ten shares preferred and five non-par value. With him was one Williams, a confederate, whom he introduced as also a Stone & Company salesman. Williams, in the presence of Brown, represented

that the company was offering exclusively to its stockholders shares at $20 a unit—a unit being two shares of preferred and one of non-par value—and that he had a customer for the shares at $30 per unit, and if the complainant would buy one hundred and twenty units for $2,400, he would bring him a certified check for $3,600 in ten days. The offer was so alluring that the complainant took Brown to Mr. Colyer, the president of the company, not to verify it, but, as he says, to be sure that any business transaction he may have with Brown would be "on the level," and of this, he says, he was assured without revealing the nature of the business. Evidently, more than that took place, for Mr. Colyer, speaking of the occurrence, says, and I believe him, that the complainant asked if Brown was all right to deal with in buying their stock, and that he replied he certainly was, that he had authority to sell it; that the complainant related that Brown had represented that he wanted to buy stock; that it had been over-subscribed, and that they had orders for it at $30 a unit, and asked whether it would be all right to deal on that basis, whereupon he (Colyer) reprimanded Brown for suggesting anything of that kind, and told the complainant not to buy stock on that basis, that if he wanted to buy stock in the company as an investment to go ahead and do it, but not to do it if he expected the company at any time to buy any of its stock back, and that the company was selling and not buying. He says he repeated this a second time. Later, Brown, Williams and the complainant continued their negotiations at the complainant's store. The complainant had but $1,400—$1,050 in liberty bonds and $350 in cash. Williams generously loaned him his check for $1,000. These were turned over to Brown, together with the subscription for the shares, signed by the complainant, on a printed form furnished by the company, which, as originally filled out, read: "I hereby subscribe for one hundred and twenty units, each unit consisting of two shares of preferred and one share of common stock, fully paid and non-assessable, of the Foster Screen Company, Inc., at $20 per unit, and accompany this subscription with the

full payment thereon, $2,400 cash." Brown gave the complainant a receipt on the company's printed form for the subscription for one hundred and twenty units and $1,400 cash and $1,000 check. In the course of the trial it developed that Brown altered the subscription to seventy units and the amount received to $1,400 in cash. The subscription blank thus altered and $1,400 in cash were remitted to Stone & Co. and by them forwarded to the company, which issued certificates for the seventy units and sent them to Stone & Company, who mailed them to the complainant, but he refused to receive them, it having dawned upon him that he had been tricked. A few days later an accomplice had called and tried to get him to furnish cash instead of Williams' check, upon the false plea that the laws of New York prohibited brokers lending money with which to buy stock.

There can be no doubt that the sale was brought about by a cheat and that it was accomplished substantially in the manner related by the complainant, except, perhaps, that Williams referred to the company or Stone & Company as the "customer," which complainant, in his eagerness to win his suit, may have wittingly suppressed. His testimony is not above criticism, for he stubbornly denied his signature to the subscription, even after persuasion that he was in error; but his story, in the main, is supported by the altered subscription blank and the spurious check given by Williams and noted on the receipt for the subscription.

The complainant relies on the well-established principle of law that where a person acts for another, who accepts the fruits of his efforts, the latter must be deemed to have adopted the methods employed, as he may not, even though innocent, receive the benefits and at the same time disclaim responsibility for the measures by which they were acquired. With the benefits of the contract he must accept the responsibilities. *21 R. C. L. 932; Marsh v. Buchan, 46 N. J. Eq. 595; Mick v. Corporation of Royal Exchange, 87 N. J. Law 607; Hubing v. Liberty Trust Co., 88 N. J. Eq. 322.* The remedy is to rescind and sue for the benefits. *Keen v. James, 39 N. J. Eq. 527; Kennedy v. McKay, 43 N. J. Law 288;*

*Decker* v. *Fredericks, 47 N. J. Law 469.* The principle cannot be invoked here. The complainant is an intelligent Greek. He has been in this country thirty years, and for the most part engaged in business. The fanciful story that led up to his undoing was in itself sufficient to impress him that the agents were not acting within the scope of their authority, and further, the fact that he gave no intimation of the nature of the transaction to the president of the company, and concealed what was afoot when he should have spoken, reveals not only his own cunning but his appreciation that he was venturing with Brown and Williams not as agents, but independently, and dissociated from the company. He wanted to be sure of Brown's integrity, not his authority. Besides, he was fully warned that the representations were without authority of the company. The contention that the warning by the president not to buy the stock on the basis represented by Brown was only that the company would not repurchase the stock at the increased price, and not that others would not, is a shallow evasion of the spirit of the repudiation of the fraud, for it embraced whatever scheme was related to the president, and if his words did not extend to the real situation it was because the complainant concealed it. It was sufficiently comprehensive to put him fully on his guard, and if he chose to understand it more narrowly the fault lies with him. If his cupidity overreached his judgment he has but himself to blame. It was his privilege to disregard the advice of the president and to chance with the swindlers, but in the gamble he had no right to reckon with the principal as a responsible factor in case he lost. The complainant, not the company, is chargeable with the duplicity complained of.

But it would seem that the complainant is not without relief in a proper case. In his present bill he counts simply on the false pretense of the company's agents, which has been held to be not imputable to the defendant. This is the only issue decided. The contract of subscription was for one hundred and twenty units of stock; it was fraudulently altered to seventy units before it reached the defendant company, and

therefore their minds did not meet. *Hubing* v. *Liberty Trust Co., supra.* The bill may be amended and further hearing will be given if desired.